Please be seated. Good morning. This morning we have three argued cases. One case which has been submitted on the briefs. The record of that case is 2007-3281. Scotts v. Defense. The first case on the oral argument is Adams v. Army. Ms. Stritzen, are you ready? Thank you, Your Honor. Good morning and may it please the Court. Nicole Smithson on behalf of Petitioner Craig A. Adams. The main issue before the Court this morning is whether the Merit Systems Protection Board committed reversible error when it sustained the Army's removal of Mr. Adams because he failed to maintain computer access due to some unpaid consumer debt that he had incurred several years prior to his removal. Is your contention that it's beyond the power of the Army to remove somebody for not paying his debt or remove his computer access for not paying his debt? No, Your Honor. It is not the Petitioner's contention that the Army lacks the capability to remove an employee because of the employee's unpaid debts. So what's the problem? The problem, Your Honor, is that in deciding to remove an employee, there has to be a nexus between the conduct as well as the efficiency of the service. And in this circumstance, the problem is that the nexus is purportedly that Mr. Adams would be a danger to the Army's computer systems. But in examination of the facts and circumstances surrounding his debt, he was not a threat to the computer system. Well, the only nexus is not that he's a danger to security. In Section 380-67, there's a whole list of financial matters, disqualifying factors, history of bad debts, bankruptcy, indebtedness, etc., etc. None of those factors listed in that particular document relate to security concerns, which are listed in a separate section. Well, Your Honor, I do believe, first of all, Your Honor, it's our position that Regulation 380 does not apply to this circumstance because that regulation specifically addresses security occurrences. But in the event that the Army looks to that regulation for guidance, that regulation does address the financial, the potential concerns that can be raised in financial issues in situations where there is debt. If the court were to look at Guideline F, Guideline F's stated concern is that a person who is in debt is likely to engage in illegal activities to raise funds. And because of that stated concern, it's obvious that the Army's main concern, at least as far as its regulatory guidance goes, is that a person who is in debt is subject to engaging in illegal activities to raise funds. Why does that concern disappear just because the debt is barred by the statute of limitations? Someone could feel a moral obligation to continue to satisfy that debt or could have a situation where that person can't get additional credit because the debt hasn't been satisfied. The mere fact that the debt itself is uncollectible, it seems to me, the concerns that the Army expressed here in Guideline F, what's wrong with that? Well, Your Honor, Guidelines F's stated concern is that a person who is in debt will engage in illegal activities to raise funds. If the debts are not enforceable, a person would not be subject to coercion. Why is that true? I mean, I've given you an example. Somebody can't get any credit. A person wants to buy a house to get a credit card. And because they fail to pay off their debts, the lender won't give them a mortgage on the house or won't give them a credit card. So there's still coercion under those circumstances, still pressure under those circumstances to pay off the debt and to raise funds to pay off the debt, even though the debt is legally uncollectible, right? Well, Your Honor, I guess that it is possible that someone could have coercion after a debt is no longer enforceable. But the amount of coercion and the likelihood that someone would be coerced to the point that they would risk their job in order to, you know, commit illegal activities with the Army's computer system in order to raise funds to repay a debt that is no longer legally enforceable is probably very minute. But in fact, if that debt is not collectible, it still reflects upon the credit rating of that particular individual. In order to correct the credit rating, then some action would be taken to pay that off, even though the statute of limitations is wrong. So in other words, if in fact that debt is no longer collectible, but it reflects on the credit rating of the individual, would it not be reasonable for the Army to be concerned about the fact that what could be done? Your Honor, in assessing the Army's reasonableness with regard to what could be done, the Army really needs to look at whether the individual's conduct shows that he had a likelihood for engaging in conduct that would be potentially harmful to the Army's computer system. Given the facts and circumstances surrounding this individual, which is what the Army should be looking at, the circumstances surrounding this individual indicate that he was not really subject to coercion in order to repay the debt. Let me second guess the Army and the Board about this. You know, it may be that you're correct that the Army under these circumstances shouldn't be worried about it, but for the reasons that Judge Garza and I have given you, there are, of course, situations in which it should be concerned. How can we make a judgment about whether it's a desirable policy or not under these circumstances to take away the computer access? You know, that would put us right in the middle of every removal of deciding whether the removal was a good idea. That's not our function as a system. Well, Your Honor, first of all, there's not a blanket policy that deals with what the Army should do when an individual has debt. Instead, what the regulations tell the Army is that it's supposed to take a common-sense approach to each individual. The Army is supposed to assess each individual individually, look at the person's particular circumstances. The Army needs to do so because federal employees have some right to their job, and that's provided by statute. And this Court is not being asked to step in and create some kind of blanket policy that it would apply to every single Army employee who ever had unpaid debt or who ever will have unpaid debt. Instead, what this Court is being asked to do is look at whether the Army acted reasonably when it made its decision to remove Mr. Adams. Your Honor, the Army removed Mr. Adams because it believed that his debt posed a security concern. The Board determined that Mr. Adams' integrity provided the requisite niceness for Mr. Adams to remove him. Your Honor, I apologize if I misspoke. I'm not saying that the Army had a blanket policy. What I'm saying is that the Army erred in the way that it applied the regulations to this particular circumstance because the Army stated concern, and in the words of the Army, the nexus was that Mr. Adams' unpaid debt caused him to be a security risk to the Army's computer systems. And when the Court looks at the fact that the debt was largely unenforceable, Mr. Adams had had access to the Army's computer system for over four years, and the circumstances that surrounded Mr. Adams incurring the debt or being unable to pay the debt, as well as the fact that he had perfect credit before the debt and perfect credit after the debt, Mr. Adams' risk to the security system is extremely small. And because that risk is so small, there's no nexus between his removal and the efficiency of the service. Now, Your Honor, it's also important to note that the Army stated concern- I don't know yet what the credit here is. Your Honor, the testimony that was provided at the hearing on that issue was provided by Mr. Adams and the Administrative Judge did determine that that testimony was credible. But what exactly did the Administrative Judge find? I believe that the Administrative Judge found that the records show that Mr. Adams had perfect credit before and perfect credit after. And I believe that she referred to the unperfect- Where is that from? Your Honor, I believe that she referred to the unperfect credit as a discrete incident to a period that occurred during a discrete period of time. And Your Honor, I do not have that specific site to the record in front of me, but I do believe that it is in our briefs and I can supplement our paperwork to provide the court with that specific page. In fact, when I return for rebuttal, if it's okay with the court, I'll come with a site to that page of the Administrative Judge's decision. Also, Your Honor, there's nothing in the record to show that Taycom had to accept Mr. Adams as a transfer employee. And thus, it's presumable to say that Mr. Adams was likely the best candidate for the position or one of the best candidates for the position. Additionally, the Office of Personnel Management Investigation did not uncover any derogatory information about Mr. Adams' employment with the Army as a civilian or his use of Army computers. And he had that employment for four and a half years prior to his coming to Taycom. Also, Your Honor, there's nothing in the record that contradicts Mr. Adams' assertion that he always received exemplary evaluations from his past supervisors. And neither his direct or second-line supervisor at Taycom had any adverse criticism of Mr. Adams' conduct or on-the-job performance. And perhaps most importantly, both the Administrative Judge and the Board found that Mr. Adams' death did not cause him to feel pressure to engage in illegal activities and funds. And accordingly, there's not substantial evidence to support the Army's decision to revoke Mr. Adams on the basis that he was a security risk to their computers. Also, Your Honors, even assuming that the Army was correct that Mr. Adams needed to obtain a waiver in order to maintain access to the Army's computer system and that he would have had to have engaged in some kind of repayment plan in order to qualify for that waiver, the Army acted capriciously in rejecting Mr. Adams' proposed repayment plan. Under the terms of the- This repayment plan, if I understand it correctly, was essentially, let me wait until the statute of limitations expires, and I won't have to pay you back. Your Honor, Mr. Adams' repayment plan was actually that he would make a payment arrangement with each of his individual creditors. And once the first creditor was paid off, he would move to the second creditor. There was a statement in the ALJ's opinion which states that less than two months after the removal, the establishment had been discharged in its entirety. How was it discharged? And can it provide the statute of limitations expiring on a collective note or the bank? Your Honor, I believe that the administrative law judge's finding refers to Mr. Adams' statement during his testimony that he, quote, clarified in his testimony that he did not believe that he had really corrected his report. But actually, what he meant by that statement was that the debt was no longer showing on the report, and that, he thought, showed that this was not conduct that was recent. Because the debt was so old, it no longer showed on his current report. He was not trying to be- Because of the statute of limitations. That is correct, Your Honor. Taking the debt uncollected. That is correct, Your Honor. But I believe that the key point there, though, is not that Mr. Adams said, oh, I've corrected my report, or not that he meant that he corrected his report, but that he was saying that to emphasize the fact that the debt was old and it was isolated, which was one of the security, or which was one of the mitigating factors in Guideline F. If I may just briefly address one more point with regard to your question, Your Honor. Also, Mr. Adams did not intend to just walk away from these debts as part of his plan. He rejected an attorney's suggestion that he receive a bankruptcy discharge, and he also stated that, on page 42 of the joint appendix, that his plan was to make a payment arrangement with each creditor. Once each creditor was paid off, he would move to the next creditor. He never made the statement that he wanted the debt to fall off. So for these reasons and the reasons stated in the briefs, we respectfully request that the Court reverse the Board's decision. Thank you. Thank you. May it please the Court. Mr. Adams has framed the issue before the Court as whether the Army acted reasonably in denying his computer access. And that exact phrasing of the issue only emphasizes the situation that is at play here, and that is the Army's exercise of its own judgment and its discretion in applying Army Regulation 25-2 and 380-67 and assessing these different mitigating and disqualifying concerns related to Mr. Adams' debt. At the end of the day, and as the Board found was a reasonable decision supported by ample evidence, the Army determined that Mr. Adams did not properly qualify. He was not a good risk, in some sense, for the Army to allow- This is not a security clearance issue, is it? No, sir. So the Army didn't apply it under the same standard that you would apply for security clearance? Yes, Your Honor, because the way that the regulations are written, and I do want to clarify that Army Regulation 380-67 is applicable to employees who have access to sensitive information, not only classified information. So in this case, for example, Mr. Adams had access to numerous forms of Privacy Act protective information, Social Security numbers of DOD personnel, home addresses, bank routing information, as well as access to the general intranet at the Detroit Arsenal, which includes a great deal of for-efficient-use-only information, physical locations of military vehicles, physical locations on the premises of different personnel. These are just some examples. And the regulations do apply the same- or make the same list of disqualifying and mitigation factors applicable to employees, both who need security clearances and who need access to this sensitive kind of information. That's not to say that folks who are getting security clearances don't also have additional background checks and additional considerations that come into play. Yes, Your Honor. Yes, Your Honor. And in fact- Well, again, the security clearance may entail additional stricter concerns aside from just these particular considerations and just these lists of mitigating and disqualifying concerns. But the Department of Defense, and specifically the Army, in its regulation, has made a policy decision that its information, including the sensitive information, that is an asset to the Army and that access to that asset and the trustworthiness of employees who are able to access that needs to be regulated in some fashion. So- Where does the regulation say that it applies to sensitive information? Okay. Sure. I begin the answer to that with Army Regulation 25-2. And that specifies, at paragraph- Right there. Okay. Army Regulation 25-2, which is included in the addendum to our brief. It's the first document. It's page 27 of the Army Regulation. No, but what page is it? I missed the brief. Is it the same page, 27? The only page number on that page is 27, Your Honor. Section 5. So this is exactly- Section 5. And this is going to refer us to the answers to your question. The answer is not in this exact section, but this is where the analysis begins. Under paragraph 4-14, it explains that these following standards are set up for the type of background checks that are going to be needed for these different IT positions. Mr. Adams was an IT 3. And the last sentence under preamble paragraph 4-14 states additional guidance is available in DOD 5200.2-R. Now if we were to flip forward to the next document in the addendum, it's Army Regulation 380-67. The very first page of that, which is Roman numeral 1 at the bottom, in the history and summary section at the beginning, explains that this regulation, 380-67, contains all of DOD 5200.2-R, which is, of course, the regulation just referenced in 25-2. Now, 380-67, the next page in the addendum here is page 5, paragraph 2-101, explains that the security standard that must be applied to determine whether a person is eligible for access to classified information or assignment to sensitive duties. And that's what's at play here, that Mr. Adams, by virtue of having had some sensitive duties, albeit we acknowledge he was in an officially classified, non-sensitive position, these were sensitive duties that he had to undertake in his position. Additional authority for the idea that these same types of mitigating and disqualifying and mitigating factors applies both for those who need security clearances as well as those who have access to sensitive information is in 32 CFR 154. And there is, I'll put my hands on the right section here, section 154.18, explains that there are certain positions that don't necessarily require access to classified information, but that nonetheless allow an employee to have access to that kind of information that needs a trustworthiness, reliability assessment before the individual can have access. That's 32 CFR 154.18 explains there are certain categories of positions or duties which, although not requiring access to classified information, if performed by untrustworthy persons, could enable them to jeopardize the security of the command or otherwise endanger the national security. And the investigative requirements are detailed in this section. That regulation has almost identical disqualifying and mitigating factors. Or his access to the computer. Yes, Your Honor. He was told that he needed to address these unpaid debts. And the Army did not necessarily... Yes, Your Honor. Yes, Your Honor. We can see that in a series of email communications. There were at least seven different email communications back and forth and then several face-to-face meetings during which this was discussed. The email communications... began at approximately page 175 of the record. And then as you turn further back in the joint appendix, the emails go in reverse chronological order. Well, just give me one second. Okay. Well, let me... I'll give you an example from earlier in the record. And this is actually the very last email in the chain. Page 42 of the record is an email from Mr. Adams to Ms. Bedwell, who was an assistant to the security official who made the computer access determination here. And Mr. Adams, in his own words, explains that he's considered the suggestions to contact a consolidation company and come up with an agreement plan, but that in the end, he's making the decision that it's not feasible or in his best interest to do so. Two paragraphs down... Yeah, but where do they tell him that he will lose his computer access if he doesn't do this? Okay. Well, two paragraphs down, Mr. Adams himself recognizes that by saying, I would sincerely hope that you and the G2 office will reconsider and allow me to continue on with the course that is actually feasible and in my best interest, referring to this piecemeal plan. Now, I can also find you information from the agency then to Mr. Adams. Page 167... I'm sorry, 176. 176 of the record. At the top of the page there is the email which immediately precedes the one that we just looked at. So, page 175, you see a duplicate of the email that I was just referring to. And at the top of page 176, Ms. Bedwell explains that Mr. Adams needs to provide the information that shows he has consolidated his debts or that his creditors have agreed to a repayment plan. They need to see documentation. If you fail to provide this by Wednesday, 2 November 2005, Mr. Simonini will recommend an immediate suspension of your computer access. This was the email that initiated Mr. Adams writing back and saying, Please reconsider. I've decided that I need to pursue this piecemeal plan by which the older debts would be taken care of by the statute of limitations. And the Army, in legitimate concerns and proper exercise of its discretion, decided that that piecemeal plan was not good enough. Just to clarify a couple of factual points that came up in counsel's presentation. What has been referred to in the opinions below as the piecemeal plan did in fact include as part of the plan that Mr. Adams' older debts would never be paid, that they would be taken care of by the statute of limitations. An example of where we can find this in the record is at page 16. There, the dissenting board member explained that the plan was to pay off one debt at a time until the debts were resolved, preferably with help from the statute of limitations. So Mr. Adams' plan was that he would just continue on the course that he had been on for approximately seven years, during which time he made just one single $200 payment on an admitted $40,000 worth of debt. And his plan was that he would continue making that same bad decision, just not acknowledging and not dealing with that debt in a responsible fashion. There are a number of notes in the appendix, starting at page 197 or 198, on what appeared to be a letterhead of, but I'm not sure whose letterhead or if indeed it's a letterhead. But these are individual notes relating to what appear to be individual debts, seemingly memorializing telephone contacts. Can you explain what these are? Yes, Your Honor. These are Mr. Adams' typed notes from his telephone conversations with the various creditors. So he was not trying to hide from all of these creditors, and in fact he contacted all of the creditors and discussed with them possible resolutions, correct? Yes, Your Honor. He has acknowledged that these debts were valid from the beginning. And these initial contacts were in response to the agency's process of working with Mr. Adams to give him an opportunity to enter into some kind of plan and address these debts in some fashion. The court concluded that it agreed with the administrative judge that it wasn't showing that the indebtedness was going to put him in a position where he would have to engage in illegal acts of generating funds. They may agree, but the court agreed with the AHA on that point. But then went on to find that the record reflects that there's a lack of a sort of financial responsibility and integrity overall. Is that consistent with the record that shows that he actually contacted all of these counselors and at least discussed with them possible resolutions? Was it just ducking and waiting for the clock to run out and have these things fall off? It is consistent, Your Honor. The credit notes that we were just looking at, I believe the end result of those conversations was this 40,000 figure that Mr. Adams says reflects his current amount of debt. He spoke with the different creditors, and the figure of his outstanding debt changed from approximately $60,000 on the OPM background investigation to now $40,000. Based on those conversations, many of the creditors said they were willing to settle for something less than the current amount of debt that was on the books. And that idea is reflected at page 12 of the record in the board's decision, where they explain in a footnote that the $40,000 is the amount for which the creditors indicated they were willing to settle. The step that was then missing was any plan by Mr. Adams to actually set up a repayment schedule or consolidation or some kind of plan to actually do anything to start repaying these debts. So he did make the initial step of clarifying that he owed less than the agency originally thought he did, based on the OPM report. But aside from one single $200 payment over the approximately seven-year period that these debts were outstanding, that's the only tangible effort he took towards making himself eligible for a waiver for this computer access. I think he has a clear problem with our standard for view, because there does seem to be substantial evidence here to support the board's decision. But it's not as entirely open and shut as it may appear. It seems to me that there is a, this had to be redone. It's not unreasonable that some other body might conclude otherwise based on this record. But nonetheless, we are faced with a difficult standard of review. Yes, Your Honor. And I see that I'm now out of time. And for that reason and those expressed in our brief, we just ask for an affirmative support. Thank you. Thank you, Mr. Chairman.  Thank you, Your Honor. Your Honor, the standard of review in this case does not preclude the court from reversing the board's decision. The evidence does not support the board's conclusion in that Mr. Adams, the Army acted capriciously in rejecting Mr. Adams' plan. Mr. Adams' plan was not, as the Army indicated, to allow debts to fall out of his credit report and to no longer pay on those debts. And the Army, in support of its assertion that the record showed that, referred to the dissenting opinion, but the Army didn't refer to any testimony or any writing by Mr. Adams indicating that that was part of his plan. But to the extent that the Army is asking the court to adopt some kind of blanket policy where it does not assess the merits of a decision to revoke computer access, the court shouldn't do that for the following reasons. First of all, it would thwart Mr. Adams' opportunity to have a meaningful review of his removal. And secondly, it would insulate decision-makers who possibly may have an illegal reason for wanting to remove an employee from having that decision reviewed. For example, if a decision-maker wanted to remove an employee for a reason that everyone would agree was illegal, like racial or ethnic reasons, the decision-maker could wait for the employee to see something that the decision-maker didn't like and then say, oh, you got a speeding ticket. That shows a disregard for law. I'm going to revoke your computer access. And because you no longer have access, you can't perform the services that we need you to perform. Also, Your Honor, there are cases cited by the court on page 9 of its decision which indicate that those decisions can be reviewed, those types of decisions, and also the site for the administrative judge's assessment that these occurred from a discrete time period can be found on page 30 of the joint appendix. Thank you very much.